[Cite as *State v. Shappie*, 2025-Ohio-1629.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                         :

      Plaintiff-Appellee,                      :                  No. 24AP-327
                                                                                      (C.P.C. No. 20CR-1040)
v.                                                            :
                                                                                   (REGULAR CALENDAR)
Brandy A. Shappie,                               :

      Defendant-Appellant.                   :

———————————

D E C I S I O N

Rendered on May 6, 2025

———————————

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *The Law Office of Eric J. Allen, Ltd.*, and *Eric J. Allen* for appellant.

———————————

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Brandy A. Shappie, appeals from a judgment of the Franklin County Court of Common Pleas convicting her of felonious assault and domestic violence. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In February 2020, the Franklin County Grand Jury charged Shappie with one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony, and one count of domestic violence, in violation of R.C. 2919.25, a first-degree misdemeanor. Shappie pleaded not guilty, and the matter ultimately proceeded to a jury trial in March 2024. As pertinent to this appeal, the following evidence was adduced at trial.

{¶ 3}   J.W. testified as follows.  Shappie is the mother of his two youngest children, twins who were 17 years old at the time of trial in 2024.  J.W. met Shappie while spending time in Myrtle Beach, South Carolina.  They tried raising the children together, which proved unsuccessful, and the custody dispute went to court for resolution.  Consistent with the court-ordered custody arrangements, on October 20, 2019, J.W. and Shappie planned a time and place to exchange the children from him to her.  They needed to change the exchange location multiple times, and by the time they met at the Bob Evans restaurant in Dublin, J.W. was angry at Shappie because she was "always late."  (May 18, 2024 Tr. Vol. 2 at 197.)  During the exchange, Shappie repeatedly "back[ed] up . . . and hit" him with the front of her vehicle.  (Tr. Vol. 2 at 200.)  He was struck by the vehicle three times and sustained injury to his knees, including a torn meniscus in one knee.  When presented with a photograph of his leg taken after the incident, J.W. explained that it showed some swelling on the leg from the impact with the vehicle.  J.W. acknowledged that, in a text message to his daughter after the incident, he stated, "She almost hit both you and me."  (Tr. Vol. 2 at 243.)

{¶ 4}   Officer Scott Nichelson, of the Dublin Police Department, testified that, on October 20, 2019, he responded to a report of domestic violence at the Bob Evans on Post Road in Dublin.  When he arrived at the scene, he spoke with J.W., who reported to him what had occurred.  He later spoke with Shappie by cellphone.  Officer Nichelson also collected video recordings from the Bob Evans surveillance camera and from J.W.'s cellphone.  These recordings of the event were played for the jury.  Together, these recordings reflect an argument between J.W. and Shappie, and they show Shappie driving her vehicle in J.W.'s direction, striking him at least once, as he stood near his vehicle.  When J.W. was struck, he responded with an exclamatory statement directed toward Shappie, although he did not make any statement indicating the infliction of significant injury.

{¶ 5}   Shappie testified in her own defense.  She met J.W. when she was working in South Carolina.  They began dating, and in January 2007, she gave birth to twins.  Her relationship with J.W. deteriorated over time, and she moved away from him with the children. They attempted to co-parent without involving the courts, but it was difficult, and eventually their custody arrangements were determined by a court order. When they would exchange the children, communication between Shappie and J.W. was poor, and J.W.

would make things difficult for her by changing the time and location of exchanges. At the exchange at issue here, Shappie was the first to arrive. When J.W. arrived, he was upset with her. Shappie also became agitated when they interacted outside their vehicles, but she went back into her vehicle to calm down and waited for the children. After a few minutes, the children got into her vehicle, and she began to drive away. Because one of the children left her cellphone in J.W.'s vehicle, they quickly returned to retrieve it. As they returned, J.W. was standing outside his vehicle recording her on his cellphone, and she was yelling at him for the child's cellphone. Her daughter retrieved the cellphone and returned to the vehicle. J.W. came towards Shappie and struck her vehicle with his hands. Her daughter got back into the vehicle, and J.W. went behind her vehicle as she was backing up. She stopped the vehicle, pulled forward, and left the area. She denied ever trying to hit J.W. with her vehicle. She acknowledged, however, that at some point during the incident he "was hit in the knees" by the vehicle. (Tr. Vol. 2 at 304.) She blamed this on his conduct of repeatedly approaching her vehicle.

{¶ 6} Following deliberations, the jury found Shappie guilty of committing felonious assault and domestic violence, as charged in the indictment. For these offenses, the trial court imposed a sentence of 24 months of community control.

{¶ 7} Shappie timely appeals.

## II. Assignments of Error

{¶ 8} Shappie assigns the following two assignments of error for our review:

> I. The State of Ohio failed to produce sufficient evidence to sustain the convictions for felonious assault and domestic violence violating appellant's right to due process guaranteed by the Fifth Amendment to the Federal Constitution and the Supreme Court of the United States holding in Jackson v. Virginia[.]
>
> II. The convictions for felonious assault and domestic violence in this matter were not supported by the manifest weight of the evidence[.]

## III. Discussion

{¶ 9} In Shappie's first assignment of error, she contends there was insufficient evidence to support her felonious assault and domestic violence convictions. And her

second assignment of error alleges her convictions were against the manifest weight of the evidence. These assignments of error are not well-taken.

### A. Sufficiency of the Evidence

{¶ 10} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 2014-Ohio-1251, ¶ 38 (10th Dist.), citing *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 11} Here, the jury found Shappie guilty of one count of felonious assault and one count of domestic violence. R.C. 2903.11(A), which prohibits felonious assault, provides that "[n]o person shall knowingly . . . [c]ause serious physical harm to another . . . [or] cause, or attempt to cause, physical harm to another . . . by means of a deadly weapon." For the purpose of R.C. 2903.11(A), a "[d]eadly weapon" is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2903.11(E); R.C. 2923.11(A). R.C. 2919.25(A), which prohibits domestic violence, states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." For the purpose of this statute, a "family or household member" includes the "natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent." R.C. 2919.25(F)(1)(b).

{¶ 12} As pertinent to both offenses, " '[p]hysical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration.' " R.C. 2901.01(A)(3). And "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). In considering whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime. *State v. Ingram*, 2012-Ohio-4075, ¶ 22 (10th Dist.). Culpable mental states are frequently demonstrated through circumstantial evidence. *Id.*

{¶ 13} In challenging the sufficiency of the evidence, Shappie argues her vehicle was not a deadly weapon, there was a lack of physical evidence to support the convictions, and there was lack of evidence that J.W. sustained any serious physical harm. She also argues the victim, J.W., acknowledged at trial that he had previously stated that he was "almost" run over by the vehicle, thereby undermining his testimony regarding the incident. (Tr. Vol. 2 at 219.) These arguments all fail.

{¶ 14} At issue is whether evidence at trial reasonably showed Shappie knowingly caused, or attempted to cause, physical harm to J.W. by means of a deadly weapon. Because an automobile, as a "large and heavy instrument that is fully capable of inflicting death or serious bodily injury, even if traveling at a relatively slow speed," it can be classified as a deadly weapon, depending on the facts and circumstances of a case. *State v. M.L.D.*, 2016-Ohio-1238, ¶ 36 (10th Dist.). *See State v. Pennock*, 2024-Ohio-6117, ¶ 35 (11th Dist.), quoting *State v. Walker*, 2023-Ohio-4690, ¶ 21 (2d Dist.) (noting " 'Ohio caselaw is replete with examples of vehicles being considered deadly weapons' "). "When determining whether an automobile is a deadly weapon, a court should consider the intent of the user, the nature of the weapon, the manner of its use, the actions of the user and the capability of the instrument to inflict death or serious bodily injury." *M.L.D.* at ¶ 36.

{¶ 15} Evidence at trial, when viewed in favor of the state, demonstrated that Shappie directed the movement of her automobile (a sport utility vehicle) towards J.W., who was standing nearby, with intent to cause him harm. J.W. testified that Shappie repeatedly "back[ed] up . . . and hit" him with the front of her vehicle, injuring him. (Tr. Vol. 2 at 200.) J.W. further testified that a photograph taken after the incident showed some swelling on his leg from the impact. The videos played for the jury, which consisted of videos from a cellphone and a surveillance camera, supported J.W.'s testimony that Shappie struck him with her vehicle. The surveillance video is grainy and has relatively low frames per second, limiting its smoothness and clarity. And the angle of the cellphone video did not provide a direct view of the vehicle striking J.W. But from what can be seen and heard in these videos, they are consistent with J.W.'s testimony that Shappie intentionally struck him with her vehicle. The cellphone recording shows Shappie angrily screaming at J.W. immediately before her vehicle moved in his direction, and the vehicle's impact with J.W. can be heard. In response to the impact, J.W. speaks to Shappie, but there is no

indication on the recording that he was in immediate, significant pain. In the surveillance video, Shappie's vehicle can be seen repeatedly moving towards J.W., and it appears to strike him at least once.

{¶ 16} Although the evidence did not show that J.W. was completely run over by Shappie's vehicle, such evidence was not necessary for the jury to convict her of felonious assault. And, because the evidence reasonably demonstrated that Shappie used her vehicle as a deadly weapon, it was unnecessary for the state to show that J.W. suffered serious physical harm. Relatedly, the state was not required to present physical evidence of his injury to prove the necessary elements of the charged offenses. *See State v. Poindexter*, 2021-Ohio-1499, ¶ 22 (10th Dist.) (noting that physical evidence is not necessary to sustain a conviction). Even so, J.W. testified that he had some swelling on his leg from the impact, and that the photograph of his leg showed the swelling. We find J.W.'s testimony and the video evidence demonstrating Shappie knowingly used the vehicle as a deadly weapon, and caused, or attempted to cause, physical harm to J.W., the father of her children, was sufficient to prove felonious assault and domestic violence.

{¶ 17} Because the evidence reasonably established all the elements of felonious assault and domestic violence, we overrule her first assignment of error.

### B. Manifest Weight of the Evidence

{¶ 18} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the [manifest] weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). This deference given to the jury by this court considers the "trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses." (Further quotation marks deleted and citations omitted.) *State v. Guice*, 2019-Ohio-1324, ¶ 29 (10th Dist.). *See State v. Cattledge*, 2010-Ohio-4953,

¶ 6 (10th Dist.), quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (noting the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony' ").

{¶ 19} An appellate court considering a manifest-weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 2014-Ohio-2501, ¶ 22 (10th Dist.), citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 20} In challenging her convictions as being against the manifest weight of the evidence, Shappie argues J.W. lacked credibility. She asserts J.W.'s self-diagnosis of his injury (a torn meniscus) was not based on expert medical evidence and was inconsistent with other evidence at trial, and J.W. had a motive to lie at trial because they had been in a romantic relationship that became acrimonious. According to her, J.W.'s lack of credibility demonstrates her convictions were against the manifest weight of the evidence. We are unpersuaded.

{¶ 21} Determining J.W.'s credibility regarding the event at issue, including resolving the conflict between his testimony and Shappie's testimony, was primarily assigned to the jury. At trial, Shappie and J.W. provided contrary versions of the circumstances that form the basis of this case. Shappie denied ever trying to hit J.W. with her vehicle; conversely, J.W. testified that Shappie repeatedly drove her vehicle towards him as he stood by his vehicle, striking him each time. He also testified that he sustained a torn meniscus in his knee because of the impact from the vehicle. The videos played for the jury were consistent with J.W.'s recollection of the event at issue, except his audible response to being struck, recorded on his cellphone, did not seem to align with his testimony that he sustained a torn meniscus. Immediately after impact, J.W. did not cry

out in pain or make another response indicating the infliction of a significant injury at that moment. But he did testify that he sustained some swelling on his leg from the impact, and that this swelling is shown in a photograph taken after the incident. Further, and as discussed above, determining whether J.W. was injured, or the extent of any injury, was not necessary to resolve Shappie's guilt or innocence of committing the charged crimes. Thus, while there was conflicting evidence at trial, the jury was in the best position to evaluate credibility and resolve the central and disputed facts. Based on our careful review of the record, we cannot conclude the jury clearly lost its way in convicting Shappie of felonious assault and domestic violence.

{¶ 22} For these reasons, we find Shappie's convictions were not against the manifest weight of the evidence. Accordingly, we overrule her second assignment of error.

## IV. Disposition

{¶ 23} Having overruled Shappie's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON, P.J., and EDELSTEIN, J., concur.

———————————————